**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

MOHAMED SALEM,                          )
                                        )
            Plaintiff,                  )
                                        )
                                        )   Civil Action No. 22-CV-10350-AK
v.                                      )
                                        )
STONEHAM POLICE DEPARTMENT              )
and TOWN OF STONEHAM,                   )
                                        )
            Defendants.                 )
_____)

**MEMORANDUM AND ORDER ON PARTIES'**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**ANGEL KELLEY, D.J.**

The following case is about what Defendant's counsel describes as a "bad day."  On

December 21, 2018, Plaintiff Mohamed Salem ("Salem" or "Plaintiff"), a licensed real estate

agent, was preparing a house for a showing at 19 Danby Road, when two Stoneham police

detectives approached the house shouting, ordered Salem outside, and handcuffed him, all while

aiming a gun at him.  [Dkt. 1-3 at 7-9].  No questions were asked.  Pleading for his life, Salem

yelled, "I'm a [r]ealtor; I can show my badge—I can show my ID; give me a chance to show my

ID."  [Dkt. 60-14 at 44].  Salem's client appeared moments later.

 Salem brings this suit asserting claims under 42 U.S.C. § 1983 against the Town of

Stoneham ("Defendant" or "Town"), alleging the Town violated his Fourth Amendment rights to

be free from unreasonable search and seizure and excessive force, as well as his Fourteenth

Amendment rights under the Equal Protection Clause.  Salem asserts a state law claim of

negligent training and/or supervision under the Massachusetts Tort Claims Act ("MTCA"),

Mass. Gen. Laws ch. 258, § 2, in addition to several tort claims.  The Town filed a Motion for Summary Judgment and Salem filed a Cross-Motion for Summary Judgment.  For the reasons set forth below, Defendant's Motion for Summary Judgment [Dkt. 59] is **DENIED IN PART** and **GRANTED IN PART** and Plaintiff's Cross-Motion for Summary Judgment [Dkt. 64] is **DENIED.**

## I.    FACTUAL BACKGROUND

In evaluating the cross-motions for summary judgment[1], the Court relies on the parties' statements of material facts, responses thereto, and any attached exhibits the parties have submitted.  [See Dkts. 60, 61, 65, 66, 71, 72, 75, and 76].  The Court accepts as true each material fact to the extent it has not been disputed by the opposing party and considers contested each material fact that either party has disputed.  Unless otherwise noted, the facts below are undisputed.

### A.    Mohamed Salem

Salem is an immigrant from Egypt, who works as a licensed real estate agent in the United States.  [Dkt. 66 at ¶ 2].  During the Arab Spring in Egypt, Salem had numerous negative experiences that caused him to suffer from post-traumatic stress disorder ("PTSD"), including being stopped and detained by the police, witnessing the killing of people by the police and military, and carrying the dead bodies of his friends.  [Id. at ¶¶ 5-6].  Salem also suffers from a pre-existing condition, Trigeminal Neuralgia ("TN"), that is aggravated by stress.  [Id. at ¶ 3].  Salem maintains that his TN worsened after the incident.  [Dkt. 65-9].

---

[1] The Court notes that the docket indicates Plaintiff filed a Partial Motion for Summary Judgment.  [Dkt. 64]. However, the actual motion and memorandum, and all subsequent filings, indicate that Plaintiff is moving on all counts.  Therefore, the Court will construe the motion as a complete motion for summary judgment.

**B.**     **Town of Stoneham Policies and Police Personnel**

Plaintiff brought this suit naming the Stoneham Police Department and the Town of Stoneham as defendants.  As a threshold matter, the Court addresses the Plaintiff's claims against the Stoneham Police Department.  Police departments are not separate suable entities.  See Nasir v. Town of Foxborough, No. 19-CV-11196-DJC, 2020 WL 1027780, at *6 (D. Mass. Mar. 3, 2020) (explaining that because the Foxborough Police Department is not an independent legal entity but rather a department of the municipality, it is not a suable entity for any of the claims alleged by the plaintiff); see also Henschel v. Worcester Police Dep't, Worcester, Mass., 445 F.2d 624, 624 (1st Cir. 1971) (holding that the Worcester Police Department is not a suable entity).  Despite the overwhelming caselaw indicating police departments are not independent legal entities, Salem insists the Stoneham Police Department should remain in the caption of this case because it "will cause less confusion to a jury who would otherwise have to be instructed on the nuanced legal relationship between the Police Department and the Town of Stoneham." [Dkt. 65 at 2].  Unconvinced there is not an ulterior motive as suggested by the Town to generate bias against the police, the Court dismisses all claims against the Stoneham Police Department as a named defendant.  The Court will refer to "Defendant" instead of "Defendants" throughout the opinion to reflect the single accurate party in this suit—the Town of Stoneham.

Police Detective Paul Norton ("Norton") is a 24-year police veteran and Police Detective Patrick Carroll ("Carroll") is a 17-year police veteran.  [Dkts. 66 at ¶ 20; 60-8 at 7].  Both detectives complete yearly in-service training requirements, in addition to 16 hours of training covering criminal law and criminal procedure updates.  [Dkt. 66 at ¶¶ 19 - 21].  There is no evidence in the factual record of previous material disciplinary infractions or complaints against either Norton or Carroll, with the exception of one not worth mentioning here.  [Id. at ¶ 25].

### C.      The Police Encounter on December 21, 2018

The single-family house located at 19 Danby Road had been on the real estate market for 82 days as of December 21, 2018, and it had been vacant for two years.  [Dkt. 66 at ¶ 26].  Police Detective Norton knew the house was unoccupied.  [Id. at ¶ 27].

One of Salem's clients, Alaa-Eldin Abbas ("Mr. Abbas") asked to see the house, and they made arrangements to view the house on December 21 around noon.  [Dkt. 65-1 at 42-43]. Salem arrived at 19 Danby Road at around 12:00 p.m. on Friday, December 21, 2018.  [Dkt. 66 at ¶ 30].  He used a ride-sharing service to travel to the house because his vehicle was at a dealership for service.  [Id. at ¶ 31].  He used the key from the lockbox on the front door and entered the house carrying a backpack.  [Id. at ¶ 32; Dkt. 76 at ¶ 4].  As he was waiting for his client to arrive, Salem turned on the lights.  [Dkt. 76 at ¶ 5].  He texted Mr. Abbas at 12:10 p.m. and inquired about his whereabouts.  [Dkt. 66 at ¶ 33].  At 12:15 p.m., a call was made to the Stoneham Police Department and the following information was exchanged between the caller and the dispatcher:

- **Caller**: "Hi yes, if you can send someone out to 19 Danby Road. The house is up for sale but there's somebody that went into the house, there's no car around and they have a backpack on their back . . . I don't know if it's someone looking for a house."

- **Dispatcher**: "Did they unlock the door?  Did they go through a window?  What's the story?"

- **Caller**: "My mom said . . . she saw someone go through the front door.  They had a backpack on.  There's no car.  So I don't know if she saw how they unlocked it . . . it's [inaudible] that somebody will be there without a car."

- **Dispatcher**: "Are you there, miss?"

- **Caller**: "I am not.  She called me to let me know that this is going on.  She's at my house[.]"
- ***Dispatcher*** *sends units to an address and mentions an unknown man had entered a house that is up for sale.*
- **Dispatcher**: "Did she say what this person looks like, miss?"
- **Caller**: "She didn't.  She just said it's a man.  It's probably nothing but I do not want to [inaudible].  He does have a backpack."

[Dkt. 84].

Carroll and Norton were in the vicinity for an unrelated call and were the first to respond. [Dkt. 66 at ¶ 36].  According to the detectives, they both believed the radio dispatch described a possible active breaking and entering.  [Dkts. 60-7 at 12; 60-8 at 16-17].  They arrived at the house at 12:21 p.m.  [Dkt. 66 at ¶ 41].  The parties disagree how the next few minutes unfolded. The police detectives state that the front door appeared open [Id. at ¶ 41], but Salem states he opened the door for the police detectives.  [Dkt. 60-2 at 48].  Salem contends that he did not know Carroll and Norton were police until they took out their handcuffs.  [Dkt. 66 at ¶ 53]. Carroll and Norton testified that they always wear their badges near their hip.  [Dkts. 60-7 at 18; 60-8 at 13].  Mr. Abbas, who arrived in the middle of the incident, immediately identified Norton and Carroll as police officers by their "dark police uniform" and their badges on their uniform. [Dkt. 60-14 at 39-40].[2]

According to Carroll, he went to the side of the house on the left to cover the back while Norton made his way to the front of the house.  [Dkt. 66 at ¶ 45].  Norton claims that, once he

---

[2] The Town submitted an affidavit regarding the police jacket and a photo of a jacket worn by Norton.  The back of the jacket says, "Stoneham Police Detective."  There is an embroidered patch on the jacket sleeve that says, "Stoneham Police."  [Dkts. 60-12; 60-13].

saw someone through the window, he took out his gun at the "low ready" position[3], announced his presence, and yelled at Salem to come out showing his hands.  [Dkt. 66 at ¶ 47].  Salem disputes that the firearm was at "low-ready," but was rather pointed at his chest or head.  [Dkt. 60-2 at 51].  Salem stated that the police detectives shouted, "put your fuckin' hands up" and "get on your fuckin' knees" and ordered him to get on the ground before handcuffing him. [Dkts. 76 at ¶ 6; 60-2 at 56].  Mr. Abbas said he saw Salem on his knees while being handcuffed next to another officer holding a gun.  [Dkt. 60-14 at 38].  Mr. Abbas heard Salem repeatedly state, "I'm a [r]ealtor, I can show my badge—I can show my ID; give me a chance to show my ID."  [Dkt. 60-14 at 44].

Both parties agree that Salem complied with all demands.  [Dkt. 66 at ¶ 60].  Salem believes he remained handcuffed on the ground for about 5 minutes while the police detectives maintain it was only a couple of minutes.  [Dkt. 66 at ¶¶ 62-63].  At 12:23 p.m., Officer Thomas Day arrived.  [Dkt. 66 at ¶ 69].  Norton stated that after uncuffing him, Salem laughed and said the incident will make for a good story for his friends later.  [Dkt. 60-7 at 11].[4]  Salem disputes that he ever laughed.  [Dkt. 66 at ¶ 70].  The parties agree that everyone entered the house after the police detectives uncuffed Salem, and the police detectives were given a tour of the house. [Dkt. 66 at ¶ 75].

On March 13, 2020, roughly 14 months later, upon receiving a letter from Salem's attorney on February 26, 2020, then-Chief of Police, James McIntyre, directed Lieutenant David

---

[3] The Town's expert, Robert Pomeroy, former Plymouth Chief of Police, describes the "low ready" position as the following: "A 'low ready' position of holding a firearm is one in which a firearm is in the user's hand, the finger is off the trigger, and the muzzle or barrel is pointing below the target.  In a 'low ready' position, the firearm is not pointing towards the ground, but just below the potential target."  [Dkt. 60-11 at 15].

[4] The Town claims that Lieutenant Stefanelli reported that Salem appears to be laughing in radio recordings.  [Dkt. 66 at ¶ 71].  At the hearing, the Court indicated that this recording can't be located, and nothing has been provided to the Court since the hearing.

Stefanelli to conduct a staff investigation.  [Dkts. 66 at ¶ 79; 60-1 at 1].  Lieutenant Stefanelli's

investigation included retrieving the Computer Aided Dispatch (CAD) log entry, gathering

letters from all officers and detectives involved, interviewing the original caller, interviewing the

caller's neighbor, reviewing the dispatch telephone line, reviewing all recorded radio

transmissions, and reviewing all of the police reports submitted.  [Dkts. 66 at ¶ 79; 60-1].

Lieutenant Stefanelli did not interview Norton or Carroll.  [Dkt. 60-1].  Lieutenant Stefanelli's

recommendation to Chief McIntyre was to clear the detectives of all allegations.  [Dkt. 60-1 at 4-

6].  Chief McIntyre agreed and closed the investigation on May 7, 2020.  [Dkt. 60-1 at 19].

### D.  Police Policy and Rules

The Stoneham Police Department promulgated two policies pertaining to the reporting of

the use of force.  The Stoneham Police Department's Use of Force Policy, Chapter 8, issued

August 1, 2006, and revised December 1, 2017, states, "An officer may draw and display his

firearm to effect an arrest or investigate a situation that he has reasonable cause to believe may

develop into a situation which involves **DANGER TO LIFE OR SERIOUS BODILY**

**INJURY** to himself or another."  [Dkt. 60-4 at 4] (emphasis in original).  The policy mandates

officers to immediately report any use of force to the officer-in-charge but carves out an

exception for the mere display of a weapon.[5]  [Id. at 5].  The Required Conduct Policy, Chapter

R-11, issued December 9, 2005, and revised November 20, 2017, mandates the reporting of *all*

use of force, *including the mere brandishing of a weapon*.[6]  [Dkt. 65-6 at 5].

---

[5] The relevant text states: "A police officer who acts in his/her capacity as a Stoneham Police Officer, whether on or
off-duty, or uses department issued equipment in the application of force, shall immediately notify the Officer-in-
Charge whenever he/she: Applies force by means of any lethal or less-lethal weapon. This does not include the mere
display of a weapon."  [Dkt. 60-4 at 4] (emphasis added).

[6] The relevant text states: "An officer who finds it necessary to use his baton, any chemical agent or his firearm in
the performance of duty shall immediately notify his Officer-in-Charge, and that said Officer-in-Charge shall
conduct an immediate investigation as to the possibility of injury to any person or property and the propriety of the
member's use of his weapon. Officers shall make a written report of any deliberate or accidental discharge of

## II.     PROCEDURAL HISTORY

Salem initiated this action in Superior Court, Middlesex County, on February 24, 2022.

[Dkt. 1].  The Town then timely removed the case to federal court on March 8, 2022.  [Id.].

After the conclusion of discovery, the Town filed the instant Motion for Summary Judgment.

[Dkt. 59].  Salem opposed the Town's Motion for Summary Judgment and responded with a

Cross-Motion for Summary Judgment.  [Dkt. 64].

## III.    LEGAL STANDARD

The purpose of summary judgment is to "'pierce the pleadings and to assess the proof in

order to see whether there is a genuine need for trial.'"  Mesnick v. Gen. Elec. Co., 950 F.2d 816,

822 (1st Cir. 1991) (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)).

Summary judgment may be granted when the record, viewed in the light most favorable to the

non-moving party, presents no "genuine issue of material fact," and the moving party is entitled

to judgment as a matter of law.  Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020).  The Court

must determine (1) whether a factual dispute exists; (2) whether the factual dispute is "genuine,"

such that a "reasonable fact-finder could return a verdict for the nonmoving party on the basis of

the evidence"; and (3) whether a fact genuinely in dispute is material, such that it "might affect

the outcome of the suit under the applicable substantive law."  Scott v. Sulzer Carbomedics, Inc.,

141 F. Supp. 2d 154, 170 (D. Mass. 2001).  Courts must evaluate "the record and [draw] all

reasonable inferences therefrom in the light most favorable to the non-moving parties."  Est. of

Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010) (citing Houlton Citizens' Coal. v. Town

of Houlton, 175 F.3d 178, 183-84 (1st Cir. 1999)).  A non-moving party may "defeat a summary

---

firearms, electronic control weapon, use of aerosol agent or baton to the Chief of Police (excluding authorized target practice): The term "use of firearm" shall include withdrawing the firearm from its holster even if there is no discharge of the firearm."  [Dkt. 65-6 at 5] (emphasis added).

judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Paul, 948 F.3d at 49 (citation omitted).

When evaluating cross-motions for summary judgment, the court must "view each motion, separately, through this prism," and "may enter summary judgment only if the record, read in this manner, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Hevia, 602 F.3d at 40 (citation omitted).

## IV.   DISCUSSION

Salem brings seven claims against the Town: negligent training and/or supervision under Mass. Gen. Laws ch. 258, § 2 (Count 1); discrimination and violation of 42 U.S.C. § 1983 (Count 2); assault and battery (Count 3); intentional infliction of emotional distress (Count 4); negligent infliction of emotional distress (Count 5); false arrest (Count 6); and false imprisonment (Count 7).  Each claim is discussed below.  Since the § 1983 claims encompass many of the elements of the other claims, the Court will discuss it first.

### A.   Discrimination and Violation of 42 U.S.C. § 1983 (Count 2)

Salem alleges that, in violation of 42 U.S.C. § 1983, the Town has shown a deliberate indifference to his Fourth and Fourteenth Amendment rights by engaging in (1) discriminatory policing, (2) excessive force, (3) unlawful detention, and (4) unreasonable seizure.  As Salem brings these claims against the Town and not the police detectives, this Court must review these claims under a theory of municipal liability.[7]

---

[7] Salem filed this Complaint against the Town of Stoneham.  [Dkt. 1].  After discovery was complete, Salem filed a Motion to Amend the Complaint to add the individual police detectives as defendants.  [Dkt. 52].  This Court denied that motion as it came 10 months after the deadline to amend the pleadings.  [Dkt. 58].  This Court found that the addition of new defendants would likely require additional discovery, which would then impose further costs on both parties.  Moreover, Salem knew of the police detectives several months before filing the motion to amend.  Id.

Section 1983 establishes a civil cause of action for deprivation of constitutional rights, stating that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable[.]" 42 U.S.C. § 1983.  Municipalities are "persons" for the purposes of § 1983 and may be liable for the actions of their employees, but they cannot be held liable under the theory of *respondeat superior*.  Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690-91 (1978).  Thus, in order for a municipality to be held liable under § 1983, there must be a finding of two preliminary elements:  first, the plaintiff's harm was caused by a constitutional violation and, second, that the municipality is responsible for that violation.  See Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 25 (1st Cir. 2005).  After it is established that a constitutional violation occurred, the municipality is found responsible for that violation under § 1983 *only* if three additional requirements are met.  Id.

First, the plaintiff must allege a municipal action that constitutes a "policy or custom" attributable to the Town.  Id. at 26.  The existence of a municipal custom or unofficial policy cannot be established by "evidence of a single event alone." Bordanaro v. McLeod, 871 F.2d 1151, 1156-57 (1st Cir. 1989).  Attributability refers to the custom or policy that is "so well settled and widespread" that policymaking officials "can be said to have either actual or constructive knowledge of it[.]"  Id.  Second, the policy or custom must have been the cause or "moving force" behind the alleged violation.  Young, 404 F.3d at 25.  Third, the municipality must have possessed the requisite level of fault, commonly described as "deliberate indifference" to the likelihood that the policy or custom would lead to the alleged constitutional violation.  Id. at 26.

Salem alleges that the Defendant Town is liable for violations of the Fourth and Fourteenth Amendments because the Town had a custom or unofficial municipal policy of failing to adequately train and supervise its officers in using firearms in non-exigent situations. Salem also alleges that the custom or unofficial municipal policy created a risk of constitutional violations so obvious that the Town, by maintaining or tolerating it, was deliberately indifferent to citizens' constitutional rights. The Court finds that a jury could find that each prong has been met with respect to a violation to Salem's Fourth Amendment rights. However, the Court finds that Salem has not alleged sufficient evidence to sustain a Fourteenth Amendment claim under municipal liability. This Court addresses each prong of § 1983 municipal liability in turn, starting with a review of the constitutional claims and followed by a review of the elements necessary to establish municipal liability.

## 1.  Alleged Constitutional Violations

### a.   Fourteenth Amendment

Salem contends that he was racially discriminated against when the "officers saw a dark-skinned man in a predominantly white neighborhood and allowed their assumptions to control their actions, which ultimately resulted in excessive force[.]" [Dkt. 65 at 9]. The Court finds that Salem has not offered any evidence to support this claim.

Plaintiffs alleging a violation of the Equal Protection Clause must prove "that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013) (quoting Rubinovitz v. Rogato, 60 F.3d 906, 909-10 (1st Cir. 1995)). Although "exact correlation is neither likely nor

necessary . . . the cases must be fair congeners.  In other words, apples should be compared to apples." Aponte-Ramos v. Álvarez-Rubio, 783 F.3d 905, 909 (1st Cir. 2015) (quoting Dartmouth Rev. v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989) (overruled on other grounds)).

To support his Equal Protection claim, Salem only points to Massachusetts statewide data suggesting that some races are more likely to be killed by police than others, and points to data from Suffolk County[8] suggesting that Black drivers are more likely to be stopped than white drivers for the same non-traffic safety violations.  [Dkt. 65 at 8-9].  Salem claims that these statistics are "just a small portion of evidence that can be used to show the disproportionate treatment of police against citizens of color." [Id. at 9].  However, to withstand summary judgment, Salem must not half-step, but is required to put forward *all* the evidence that supports discriminatory policing by Stoneham, not just a "small portion," especially when the scant evidence offered does not implicate the Town directly.

Salem does point to a recent resignation of a Stoneham police sergeant and academy instructor that a 2023 internal investigation found to had repeatedly used racial slurs.  [Dkt. 75 at 2].  While the repeated use of racial slurs by a senior officer is not completely irrelevant to an Equal Protection claim, the relevancy of this information to this incident is limited, if relevant at all.  It does not involve either of the police detectives who detained Salem and the senior officer subsequently resigned after the Town corroborated the allegations through its internal investigation.  Salem has failed to show that the Town treated similarly situated people differently than it treated him.  Because Salem's claim of discrimination is conclusory and not sufficiently supported by evidence, the Court need not address the question of municipal liability under § 1983.

---

[8] Suffolk County is adjacent to Middlesex County, the county where the Danby Road incident occurred.

### b. Fourth Amendment

More convincing is Salem's allegations of violations of his Fourth Amendment right to be "secure in [his person] . . . against unreasonable searches and seizures."  Salem's Fourth Amendment claim rests on three theories: unreasonable seizure, excessive force, and unlawful detention.  While a finding of any of these theories will satisfy the first prong of a § 1983 municipal liability analysis, the Court will address all three.

### i. Unreasonable Seizure and Unlawful Detention

Since a detention by a police officer is a seizure, this Court will analyze both claims together.  See United States v. Chaney, 647 F.3d 401, 408 (1st Cir. 2011).  The Town admits that Salem was seized, but it argues this seizure was an investigative Terry stop rather than an arrest. [Dkt. 60 at 10].  The distinction is critical under a Fourth Amendment analysis.  Arrests, whether formal or de facto, require a showing of probable cause while temporary detentions, including Terry stops, require a lesser showing of reasonable suspicion.  See Chaney, 647 F.3d at 408. This requires this Court to make a preliminary determination whether the instant case involves a Terry stop or if the detention escalated to a de facto arrest violating the Fourth Amendment in the absence of probable cause.  See United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998).  Under the Terry doctrine, officers can briefly detain individuals suspected of criminal activity when the officer has reasonable and articulable suspicion.  United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996).  Under the right circumstances, these types of seizures are permissible because their low-level of intrusiveness was constitutional while not requiring probable cause.  See United States v. Acosta-Colon, 157 F.3d 9, 21 (1st Cir. 1998).

There are no "scientifically precise benchmarks for distinguishing between temporary detentions and de facto arrests."  Chaney, 647 F.3d at 409 (internal citations and quotations

omitted).  Generally, the inquiry rests on whether a reasonable person in that position would have understood the seizure "to be tantamount to being under arrest."  United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994).  The use of both firearms and handcuffs, as was used in Salem's detention, "will generally tilt the scale to some significant degree toward a finding of de facto arrest."  Chaney, 647 F.3d at 409.  However, these two factors, without anything more, are not determinative, and there are cases that have held that officers may draw their weapons without transforming a Terry stop into a de facto arrest.  Flowers v. Fiore, 359 F.3d 24, 30 (1st Cir. 2004) (collecting cases).  A Terry stop, even if handcuffs and firearms are used, will not morph into a de facto arrest if the officers can "point to some specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm."  Acosta-Colon, 157 F.3d at 19 (emphasis omitted).  In other words, the officers needed to point to specific facts to establish that the use of handcuffs and a firearm was required to safely carry out the investigation.  Id. at 21.

This is a burden which the Town has not clearly met as they have not pointed to any facts indicating that handcuffs and a firearm were required to carry out the stop without exposing the police detectives, the public, or Salem himself to harm.  See id. at 19.  The Town argues that its police detectives had a reasonable suspicion of a possible breaking and entering based on the 911 call, their training and experience, and the fact that there was no car parked in front of the house.  [Dkts. 60 at 10; 66 at ¶ 9].  However, the message conveyed by the dispatcher made no mention of a breaking and entering or any criminal activity and stated only that an unknown man with a backpack had entered the house.  [Dkts. 65 at 4; 65-8 at 16].  Moreover, the lack of a car does not obviously signal a breaking and entering, and Salem's behavior in approaching the door and

following the police detectives' orders to come outside does not provide any evidence of risk of harm to the detectives or the public.  Compare with United States v. Wright, 582 F.3d 199 (1st Cir. 2009) (finding an investigative stop reasonable after a man ran from the police while clutching at his waistband); and United States v. Romain, 393 F.3d 63 (1st Cir. 2004) (finding an investigative stop reasonable when officers were responding to a 911 call claiming that a man in an apartment had a gun, and, upon the officers' entry into the apartment, a man became visibly agitated and walked towards them aggressively).

To say that the use of handcuffs and a firearm is consistent with a Terry stop as the Town argues would endorse the use of handcuffs and firearms as a matter of routine in brief stops or inquiries.  See Acosta-Colon, 157 F.3d at 18.  This is a position this Court cannot take.  When there are several arrest-like features, as is the case here, officers cannot use generalized statements about security to justify a Terry stop – they must point to specific facts or circumstances which could have led them to reasonably believe these aggressive measures were necessary to maintain everyone's safety during the investigation.  Id. at 21.  The Town has not offered such facts.  Since a jury could find that this detention exceeded the permissible limits of a lawful Terry stop, the Court can proceed to the second prong of the municipal liability analysis under § 1983.

### ii. Excessive Force

There is also a genuine dispute to the reasonableness of the amount of force used in detaining Salem.  Excessive force is reviewed "according to the constitutional touchstone of objective reasonableness, so we do not consider an officer's subjective intent or motivation." Raiche v. Pietroski, 623 F.3d 30, 36 (1st Cir. 2010) (internal quotations omitted).  In other words, a plaintiff bringing an excessive force claim must allege that the force used by the

defendant was "unreasonable under all the circumstances." Morelli v. Webster, 552 F.3d 12, 23 (1st Cir. 2009). In determining what is reasonable, the Supreme Court has instructed courts to consider the following: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." Raiche, 623 F.3d at 36 (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).

Regarding the first factor, Norton and Carroll were not directed to respond to a crime, let alone a severe crime. A jury could reasonably find that the police detectives utilized excessive force when they detained and restrained Salem. The dispatcher did not communicate any information that a crime was in progress or that Salem presented a threat to anyone. As indicated in the incident report, the incident is characterized as a "check person." [Dkts. 60-1 at 10; 65-2 at 1]. When the person subjected to excessive force did not commit any crime, "the first Graham factor ordinarily cuts in the subject's favor." Gray v. Cummings, 917 F.3d 1, 8 (1st Cir. 2019).

Regarding the second factor, Norton and Carroll never state nor suggest Salem was threatening when they encountered him. [Dkts. 65-4 at 11; 65-8 at 21-22]. Their use of a firearm and handcuffs appears to have been entirely predicated on their belief that they were responding to a "possible felony," specifically a possible breaking and entering, while Salem suggests it was because of the color of his skin. [Dkts. 65-4 at 24-26; 65-8 at 24; 76 at ¶ 21]. Norton, by his own admission, unholstered his firearm as soon as he saw Salem through a window, and he pointed his weapon (allegedly at Salem's chest or head) as soon as Salem allegedly opened the door. [Dkts. 65-4 at 10-11; 65-8 at 20]. According to Salem, both Norton and Carroll shouted, "put your fuckin' hands up" and "get on your fuckin' knees." [Dkt. 76 at ¶ 6]. Carroll handcuffed him while, according to Salem, Norton kept his firearm pointed at him.

[Dkt. 60-7 at 10; 60-8 at 20].  There was no crime, no signs of aggression, and no fight.  The presence of two police detectives against Salem reduced the risk of threat the detectives faced.  See Lachance v. Town of Charlton, 368 F. Supp. 3d 231, 240 (D. Mass. 2019), aff'd, 990 F.3d 14 (1st Cir. 2021) (stating that the more officers present at a scene, the less threat the assailant poses).

The third and last Graham factor—whether Salem was resisting or evading arrest—also favors Salem.  The police detectives admit that Salem did not attempt to flee or resist arrest.  [Dkts. 65-4 at 11; 65-8 at 21-22].  Salem allegedly opened the door, followed Norton and Carroll's orders, and pleaded for his life.  His actions demonstrate the very opposite of resistance.  Compare with Flowers, 359 F.3d at 34 (finding use of firearm and handcuffs reasonable to detain a man suspected of being on his way to commit a daylight assault with a firearm).  There was no danger, no flight, and no resistance.  Given the lack of severity of the radio transmission, the lack of threat by Salem, and the lack of resistance from Salem, a reasonable jury could conclude that immediately using handcuffs and aiming a firearm at Salem was an excessive use of force.

**2. Municipal Liability**

Since a jury could find that the police detectives violated Salem's Fourth Amendment rights through unreasonable seizure, excessive force, and unlawful detention, the Court returns to the issue of municipal liability.  The second prong of municipal liability under § 1983 requires three components: (1) "the alleged municipal action at issue must constitute a 'policy or custom' attributable to the City;" (2) "the municipal policy or custom actually have caused the plaintiff's injury;" and (3) "the municipality possessed the requisite level of fault, which is generally

labeled in these sorts of cases as 'deliberate indifference.'" <u>Young</u>, 404 F.3d at 26.  Each element is examined in turn.

### a.  Existence of a Policy or Custom

Salem has alleged that the Town has a custom or policy of training officers in such a manner that the use of "excessive force . . . in non-exigent situations is sufficiently widespread that it has the force of law."  [Dkt. 65 at 12].  The Court understands this allegation to encompass a widespread practice of detention, direct use of force, and de facto arrest without the justification required to make such actions constitutional.  To prove that such a custom or policy existed, Salem must prove that it is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice."  <u>Bordanaro</u>, 871 F.2d at 1156.

In assessing the existence of a custom or policy, the Court may look at whether the Town's disciplinary practices demonstrate a broad failure to supervise and discipline its officers. <u>Id.</u> at 1159-60.  The Court finds that a jury could reasonably conclude that such a custom exists but clarifies that the custom is not just that an unwarranted amount of force was used – it is the establishment of a system that permitted police detectives and officers to disregard required reporting policies after using force.  The requirement to report is part of a system that provides notification to supervisors of "incidents as they arise" which then allows them to "implement[] appropriate training and discipline in response" if necessary.  <u>Blanchard v. Swaine</u>, No. 08–40073–FDS, 2010 WL 4922699 at *11 (D. Mass Nov. 29, 2010).  Stoneham's policy on Required Conduct, Chapter R-11, requires the reporting of all use of force, including the mere brandishing of a weapon.  [Dkt. 65-6 at 5].  No report was made here for Norton's act of drawing his firearm.

Salem suggests that the Town has three different customs: (1) failure to train; (2) failure to supervise; and (3) using firearms in non-exigent situations.  [Dkt. 65 at 11-19].  However, a failure to train claim requires allegations of a deficiency in a training program, which Salem has not provided.  Young, 404 F.3d at 26–27.  As previously stated, the Court finds that the custom at issue is a combination of theories (2) and (3), the establishment of a system that permitted police detectives to disregard mandated reporting policies after the use of force.  While similar to a failure to supervise custom, the one at issue here is narrower as it relates specifically to the disregard of the required reporting requirement as prescribed in Chapter R-11.

The Town contends that, because there is not a single complaint for misconduct launched against the police detectives, Salem has not provided enough evidence to allege a widespread custom or policy.  [Dkt. 71 at 8].  The First Circuit has held that, while "evidence of a single event alone cannot establish a municipal custom or policy," the single event alone can be proof of a custom or policy when it "involves the concerted action of a large contingent of individual municipal employees[.]"  Bordanaro, 871 F.2d at 1156-57.  Chief McIntyre, the author of the staff investigation report, and Lieutenant Stefanelli, the Stoneham detective who initiated the investigation report upon receipt of a letter from Salem's attorney, did not require the police detectives to submit a report after being made aware that a firearm was drawn during the encounter with Salem.  Sergeant Christopher Apalakis, the highest-ranking officer on scene, spoke with Officer Day about the incident and left without speaking to Norton or Carroll. Officer Day said he saw the police detectives walking Salem out of the house and saw Salem in handcuffs, but he does not recall whether any firearms were drawn.[9]  [Dkt. 60-1 at 15].

---

[9] The factual record is not clear whether Officer Day and Sergeant Apalakis saw the firearm drawn or were told about the use of a firearm.  At the very minimum, Detective Lieutenant Stefanelli and Chief McIntyre were informed in an email as part of the staff investigation report that Norton withdrew his firearm.  [Dkt. 60-1 at 11].

At his deposition, Norton admits that he would customarily draw his firearm "any time" he responded to a "felony stop," although this was not a felony stop nor was it described as such in the dispatch. [Dkt. 65-4 at 13]. He also stated that his actions at Danby Road mirrored what he was taught at the police academy, and he described his actions as "textbook how you would respond to a call like that." [Id. at 25]. The Town appears to agree, as it states that the police detectives acted "in accordance with their training." [Dkts. 60 at 12; 71 at 4]. Neither Norton nor the Town believe a report was required, despite there being a clear policy mandating one. The decision by several individuals in the Stoneham Police Department to disregard reporting policies demonstrates that this was "the way things were done and had been done." Bordanaro, 871 F.2d at 1156. The Town and police supervisors' attitude and response illustrate this custom is sufficiently "settled and widespread." Id.

### b. Deliberate Indifference

In addition to proving the existence of a policy or custom attributable to the Town, Salem must show that the Town's conduct that caused the injury "amounted to deliberate indifference to [his] constitutional rights[.]" McElroy v. City of Lowell, 741 F. Supp. 2d 349, 356 (D. Mass. 2010) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989)). Deliberate indifference is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train," Connick v. Thompson, 563 U.S. 51, 62 (2011) (citations omitted). However, the Supreme Court has not "foreclose[d] the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof

of a pre-existing pattern of violations." Id. at 64.  That is, "in a narrow range of circumstances

. . . [t]he likelihood that the situation will recur and the predictability that an officer lacking

specific tools to handle that situation will violate citizens' rights could justify a finding [of]

. . . 'deliberate indifference'[.]" Bryan Cnty., 520 U.S. at 409.  To make a showing of deliberate

indifference, Salem must specifically allege that the Town had: "(1) knowledge of an obvious

risk to the constitutional rights of persons police would come in contact with; and (2) that there

was a conscious failure to act despite the obvious risk." Id. at 356 (citing Canton, 489 U.S. at

390).

   The Town contends that it did not disregard an "obvious risk" by failing to report the use

of the firearm because 1) there is another policy, Chapter 8, that does not require reporting and 2)

if the reporting policy, Chapter R-11, is controlling, violation of it is only a procedural

misconduct or a violation of state law, not an unconstitutional deprivation of rights.  [Dkt. 60 at

15].  The Court is not convinced by the Town's attempts to downplay their reporting policy.

Salem's expert, former Boston Police Superintendent Frank Mancini, stated in his report that the

Department of Justice, the Massachusetts Municipal Police Training Committee, and the

Commission on Accreditation for Law Enforcement Agencies all agree that the pointing of a

firearm by police is classified as a use of force.  [Dkt. 65-5 at 25].  The Town's own policy on

required conduct clarifies that use of a firearm "include[s] withdrawing the firearm from its

holster even if there is no discharge of the firearm[.]" [Dkt. 65-6 at 5].  The Town's policy on the

use of force does, indeed, state that reporting is not required for the "display" of a firearm.  [Dkt.

60-4 at 5].  The Town offers no support, however, for their argument that the first policy is, in

effect, nullified because the second policy that also addresses reporting came later.  Additionally,

a jury could reasonably determine that a "display" is not the same as "withdrawing the firearm,"

especially in light of the fact most favorable to Salem that a weapon was drawn and aimed at him rather than at a "low ready" position.

Caselaw in this Circuit supports the contention that a failure to supervise properly or investigate incidents supports a finding of deliberate indifference on the part of a municipality. See Comfort v. Town of Pittsfield, 924 F. Supp. 1219, 1233 (D. Me. 1996) (failure to properly investigate events surrounding arrest supports a finding of deliberate indifference); see also Douglas v. City of Springfield, No. CV 14-30210-MAP, 2017 WL 123422, at *10 (D. Mass. Jan. 12, 2017) (denying summary judgment since a jury could infer that the city's investigation system was ineffective and demonstrated deliberate indifference to the risks posed by officers); see also Bordanaro, 871 F.2d at 1162-63 (affirming the jury's finding of municipal liability since the officers were not sufficiently supervised, properly recruited, and trained on appropriate police force).  During oral arguments, the Town's counsel commented that the events of December 21 simply amounted to a "bad day," minimizing the police conduct and the foreseeable harm to Salem.  [Dkt. 82].  Here, a jury could reasonably conclude that, by implementing a reporting policy then subsequently disregarding it, the Town was sticking its head in the sand and not "taking steps to ensure that it was informed of problems as they arose, and thus could not implement appropriate training and discipline in response."  Blanchard, 2010 WL 4922699 at *11.

### c.  Causation

Lastly, Salem must prove that the custom was the "moving force" behind his injury.  City of Oklahoma City v. Tuttle, 471 U.S. 808, 819 (1985) (quoting Monell, 436 U.S. at 694).  In other words, there must be an "affirmative link" between the custom and the constitutional deprivation.  Id. at 809.  The Town seems to suggest that causation cannot be inferred from this

one incident.  [Dkt. 71 at 7].  As this Court has previously stated, single incidents can proceed on a § 1983 claim when a violation is a "highly predictable consequence."  Bryan Cnty., 520 U.S. at 398.  This Court finds Blanchard illustrative.  As put forth by that court, "[t]he question here, however, is not simply whether the [Town] followed its own written policies.  Rather, it is whether a reasonable jury could infer that the [Town's] failure to follow its written policies was the direct cause of [the Plaintiff's] injuries."  2010 WL 4922699, at *11.  Like the Blanchard court, this Court believes a reasonable jury could find that the department's failure to report use of force was a direct cause of Salem's injuries.  In Blanchard, the court offered two reasons a jury could draw a direct connection between the failure to follow written policies and the plaintiff's injuries.  First, a town's "failure to follow its written policies prevents" leadership from becoming aware of wrongdoing as they arise and implement appropriate training and discipline in response.  Id.  Second, a town's "failure to follow its written policies [communicates] that rules will not be strictly enforced and that officer violations will not be disciplined."  Id. at 12.  Similarly, here, when examining evidence most favorable to Salem, a jury could find that the police detective's use of a firearm when it was not warranted was a "highly predictable consequence" since they did not believe they ever had to report its use.  A jury could find that, since officers will be armed with firearms, a failure to supervise such use is equivalent to deliberate indifference.  See Canton, 489 U.S. at 388 (explaining that, since officers will be armed with firearms, a failure to train officers on how to use them amounts to deliberate indifference).

The Court finds it necessary to discuss the lack of evidence allegations used repeatedly by the Town.  The Town argues that Salem needed to provide direct evidence of prior constitutional violations by police detectives to sustain his § 1983 claim.  While early caselaw on

§ 1983 suggests this is ideal, it is certainly not required.  See Tuttle, 471 U.S. at 823–24 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); see also DiRico v. City of Quincy, 404 F.3d 464, 469 (1st Cir. 2005) (affirming the dismissal of the § 1983 claim since evidence was insufficient even though supervision or discipline of one police officer may have been lacking); compare to Kibbe v. City of Springfield, 777 F.2d 801, 805 (1st Cir. 1985) (holding that a city could be found liable if the single event involved several officers), cert. granted, 480 U.S. 257 (writ dismissed for failure to preserve issue); Bordanaro, 871 F.2d at 1157 (affirming the judgment in holding the city liable since the single incident at issue involved the concerted action of several people); Young, 404 F.3d at 29 (holding that the city could be found liable on this single incident since it was likely that, absent particularized training, violations of friendly fire shootings were likely).  The role of previous complaints, lawsuits, conduct, or other evidence is to show that the municipality had notice.  See Camilo-Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir. 1998).  When this direct evidence is not available, courts can turn to other supporting evidence.

This Court agrees with the court in Cox v. Murphy: "The issue is not whether other plaintiffs have proved constitutional violations; it is whether this plaintiff has adduced sufficient evidence that the relevant supervisors were deliberately indifferent to the rights of the citizens with whom [the defendants] came in contact."  No. 12-11817-FDS, 2016 WL 4009978, at *10 (D. Mass. Feb. 12, 2016).  For the Town, the investigation and reporting system was not just defective – it was nonexistent, and it is that crucial fact that can support a finding of liability by a reasonable jury.  See Douglas 2017 WL 123422, at *10 ("Taking [the evidence of Springfield's

investigation practices] into account, a reasonable finder of fact could conclude that Springfield's investigative process was less than effective at identifying officers prone to the use of excessive force."); see also Turkowitz v. Town of Provincetown, 914 F. Supp. 2d 62, 77 (D. Mass. 2012) ("[A] municipality's inaction is the functional equivalent of an actual decision to violate the Constitution.").  The Town makes it difficult to determine whether the police detectives had a history of using force in unwarranted situations because it has conflicting policies that directly affect the existence of records.

It is unclear to the Court whether the supervisors even knew a firearm was allegedly pointed at Salem since the investigation report (conducted two years later) only mentions that it was unholstered.  This is precisely why reporting is important.  This is not just the opinion of the Court, but also of the Department of Justice, the Massachusetts Municipal Police Training Committee, the Commission on Accreditation for Law Enforcement Agencies, and the Town itself.  [Dkt. 65-5 at 25].  With the lax enforcement of the reporting policies, Salem would have had to rely solely on civilian complaints.  Given the difficulty of accessing these complaints and, as the court found in Cox, the paucity of these complaints filed by members of under-represented communities, "there is reason to believe that the use of excessive force is [likely] underreported." 2016 WL 4009978, at *9.[10]

As the court in Cox said, "experience and common sense suggest that the paper record may not tell the entire story."  Id.  What does tell a pretty full story here, however, is what the Town asserts: that a report is not required after a Stoneham police detective aims a firearm at

---

[10] See also Oversight Models: Is one model better than another?, National Association for Civilian Oversight of Law Enforcement, https://www.nacole.org/oversight_models (last visited Sep. 26, 2024) ("Problems that exist within the police department may be systemic but are underreported because the police conduct affects people unlikely to complain—including disabled, people whose socio-economic status leaves them vulnerable and isolated. Other groups such as individuals working in sex trades or involved in gangs are not likely to report even the most egregious police misconduct. When members of marginalized groups do complain, the problem may appear to be an aberration when it is actually commonplace.").

someone.  Not only does this infringe upon the Town's ability at improving their trainings, but it also "sends a message to [their] officers that rules will not be strictly enforced" and "violations will not be disciplined."  See Blanchard, 2010 WL 4922699, at *12.

In conclusion, a reasonable jury might find that Carroll and Norton violated Salem's Fourth Amendment rights.  It might also find that the Town's police department had a custom or unofficial policy of responding to all possible felonies with drawn firearms and handcuffs in disregard of its reporting requirements.  It is not difficult to see how a reasonable fact-finder might determine that such a policy created a plainly obvious and unjustifiable risk of constitutional violations and was the "moving force" behind the actions of the police detectives on Danby Road.  Of course, viewing the record in the light most favorable to the Town, these findings are not foregone conclusions.  Therefore, the motions of both parties are denied with respect to § 1983 municipal liability for violations of Salem's Fourth Amendment rights.

This Court has laid out the § 1983 analysis to make it abundantly clear that one must not die to avail themselves of § 1983; that death is not necessary to allege a flagrant violation of one's constitutional rights; and that a "patently obvious" standard is often just common sense. The Court notes § 1983 came to life during the Reconstruction era in the Civil Rights Act of 1871.[11]  Its very purpose was to "secure the constitutional ideals of freedom and equality for all."[12]  With support from the executive office, the Act represented a comprehensive congressional strategy to cope with and challenge the violent resistance to Reconstruction.[13]

---

[11] This act is also known as the Ku Klux Klan Act.

[12] Katherine A. Macfarlane, Accelerated Civil Rights Settlements in the Shadow of Section 1983, 2018 Utah L. Rev. 639, 661 (2018).

[13] The Ku Klux Klan Act grew out of a message sent by President Ulysses Grant to Congress: "[T]he power to correct these evils is beyond the control of the State authorities I do not doubt[.] . . . Therefore I urgently recommend such legislation as in the judgment of Congress shall effectually secure life, liberty, and property, and the enforcement of law in all parts of the United States." Cong. Globe, 42d Cong., 1st Sess. 244 (1873).

Courts have heeded this call, too, by interposing themselves "between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law." Mitchum v. Foster, 407 U.S. 225, 242 (1972). Today, instead of closing the doors of § 1983, this Court elects to keep alive the promise and power intended of it.

## B. Negligent Training and/or Supervision under Mass. Gen. Laws ch. 258, § 2 (Count 1)

Salem alleges that the Town is liable under Mass. Gen. Laws ch. 258, § 2 for negligently training and supervising its officers. [Dkt. 65 at 19-20]. This statute provides that "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment." Mass. Gen. Laws ch. 258, § 2. Supervisory negligence has been found against municipalities "where the municipality knew or should have known about an underlying, identifiable tort, which was committed by named or unnamed public employees." Kennedy v. Town of Billerica, 617 F.3d 520, 533 (1st Cir. 2010). To succeed, Salem must prove: 1) the defendant owed him a duty; 2) there was a breach of that duty; 3) injury resulted from the breach; and 4) a causal connection existed between the breach and the injury. Lockhart-Bembery v. Town of Wayland Police Dep't., 404 F. Supp. 2d 373, 380 (D. Mass. 2005) (internal citations omitted). The Town assumes, for purposes of their motion, that there was a duty owed to Salem but assert that there is no evidence that it breached that duty.

Among the theories of this claim, Salem argues that the Town was negligent in training its officers in understanding dispatch calls. [Dkt. 65 at 19]. The Town argues that Salem provided no facts that support this allegation of inadequate training of understanding dispatch calls. [Dkt. 60 at 4]. This Court agrees with the Town that Salem has not provided any evidence

to support an inadequate training claim, and when there is no evidence that the employees have been inadequately trained, a failure to train claim typically fails.  See Parker v. Town of Swansea, 270 F. Supp. 2d 92, 102 (D. Mass. 2003) ("Hence, in the absence of any evidence offered by [the plaintiff] that the Town failed adequately to train its officers ..., and in the face of evidence of the officer's training ... in compliance with ... the requirements of state statutory regulations, [the plaintiff] fails to show a breach of any duty of the Town.") (internal citations omitted).

This, however, does not end the inquiry on this claim.  As stated previously, the Court finds the police detectives' (and the supervisors') disregard of the mandatory reporting requirement in Chapter R-11, Required Conduct, actionable.  The Town argues that the Use of Force policy supersedes the Required Conduct policy since it was enacted mere months later. The Town argues that the "record was clear that the controlling, most current policy clearly stated that a use of force report was not required for the mere display of a firearm."  [Dkt. 60 at 15].  The Court finds that argument unavailing, especially since the negligence needed for recovery under § 258 is similar to the negligence needed for recovery under § 1983.  See Kendall v. City of Boston No. 21-CV-10711-ADB, 2022 WL 598165, at *8 (D. Mass. Feb. 28, 2022) ("In light of the Court's ruling that the Monell claims alleged in Counts 1 and 3 can proceed, the Court finds that the same reasoning applies to Plaintiff's negligent supervision, training, and investigation theory[.]"); see also Weiss v. Lavallee, No. CV 01-40177-FDS, 2005 WL 8176485, at *22 (D. Mass. Oct. 7, 2005) (stating that the negligence standard under the MTCA is "similar, if not identical" to the deliberate indifference standard in municipal liability claims under

§ 1983).  Having already established that Salem can proceed on his § 1983 claim, this Court

allows his § 258 claim to proceed, as well.[14]

Summary judgment burdens a party to demonstrate there is no genuine issue of material

fact.  Both parties have failed in this task for both the § 1983 claim and the § 258 claim. As this

determination is a matter for a jury to decide, this Court denies both parties' motions for

summary judgment.

### C.    Negligent Infliction of Emotional Distress (Count 4)

Salem brings a claim of negligent infliction of emotional distress against the Town.

Unlike the case with intentional torts, plaintiffs can recover for negligent infliction of emotional

distress against public employers under Mass. Gen. Laws ch. 258, § 2.  See Nasir, 2020 WL

1027780, at *5 (internal citations omitted) ("Liability for the negligent acts of a public employee

committed within the scope of employment is visited upon the public employer, and not the

employee.").

To recover for negligent infliction of emotional distress, a plaintiff must prove: (1)

negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective

symptomatology; and (5) that a reasonable person would have suffered emotional distress under

the circumstances of the case.  Gouin v. Gouin, 249 F. Supp. 2d 62, 74 (D. Mass. 2003) (citing

Payton v. Abbott Labs, 437 N.E.2d 171, 181 (Mass. 1982)).  A plaintiff "must do more than

allege 'mere upset, dismay, humiliation, grief and anger.'"  Godette v. Stanley, 490 F. Supp. 2d

72, 81 (D. Mass. 2007) (quoting Sullivan v. Boston Gas Co., 605 N.E.2d 805, 809 (Mass. 1993)).

Rather, a plaintiff must offer "enough objective evidence of harm to convince a judge that their

---

[14] See discussion supra Section IV(A)(2) on municipal liability under § 1983.

claims present a sufficient likelihood of genuineness to go to trial." Id. at 82 n.57 (quoting Sullivan, 605 N.E.2d at 810).

The Town asserts that it did not breach any duty owed to Salem. [Dkt. 60 at 17]. The Town also argues that the police detectives had a reasonable suspicion that a breaking and entering was occurring and that Salem has not sustained any injures that are causally-related to the incident. [Id.]. Further, the Town maintains that the aggravation of Salem's TN and stress-related symptoms cannot be linked to the injury since they occurred months after the incident and can be explained through a number of other factors, such as his decision to stop taking his medication or his son's declining health. [Id. at 18; Dkt. 65-9 at 3]. Salem alleges that the police detectives breached their duty when they drew their firearm and handcuffed him immediately. He also alleges that his TN was aggravated by the police detectives' wrongdoing and that the evidence from the medical reports and therapist report, as well as his subjective reporting, supports this. [Dkts. 65-1 at 80; 65-9].

There is no question that a "tortfeasor takes his victim as he finds him." Figueroa-Torres v. Toledo-Davila, 232 F.3d 270, 275 (1st Cir. 2000) (internal quotations and citations omitted); see also Tobin v. Liberty Mut. Ins. Co., No. CIV.A. 01-11979 DPW, 2007 WL 967860, at *8 (D. Mass. Mar. 29, 2007), aff'd and remanded, 553 F.3d 121 (1st Cir. 2009) ("[A] defendant can be held liable through an award of emotional distress damages for aggravating a pre-existing emotional condition."). The Court finds that Salem has offered sufficient evidence to raise a question of fact as to whether the police detectives caused his TN to worsen. Because the Town denies the allegations of using a firearm in a negligent manner and any purported injuries related to the incident, genuine issues of material fact exist with regard to this claim. Any shortcomings in Salem's claims of injuries can be addressed in cross-examination at trial. Accordingly, the

Court must deny both motions for summary judgment on this claim and reserve the issue for a jury determination.

### D.        Exceptions under Mass. Gen. Laws ch. 258, § 2

As a last resort, the Town cites to several exceptions of Mass. Gen. Laws ch. 258, § 2 to escape liability on the negligence claims.  The Town's attempt to find a legal home among the exceptions calls the Court to review the history of the MTCA statute.[15]

Immunity derives from England where "the King can do no wrong."  See Trump v. United States, 144 S. Ct. 2312, 2372 (2024) (Sotomayor, J., dissenting) (citing Clinton v. Jones, 520 U.S. 681, 697, n.24 (1997) (quoting 1 W. Blackstone, Commentaries *246).  Much of English common law was adopted into the early American legal system, including this principle of sovereign immunity.  Before 1977, the Commonwealth was one of many jurisdictions that enjoyed broad immunity protections based upon common law principles.  See Cormier v. City of Lynn, 91 N.E.3d 662, 664-65 (2018) (collecting cases prior to 1977 where municipalities and employees were essentially immune from liability in tort at common law).  In 1977, the Massachusetts Supreme Judicial Court announced its intention to change this in a seminal case. See Whitney v. City of Worcester, 366 N.E.2d 1210, 1212 (1977) ("We state our intention to abrogate the doctrine of municipal immunity in the first appropriate case decided by this court after the conclusion of the next (1978) session of the Legislature, provided that the Legislature at that time has not itself acted definitively as to the doctrine.  Thereafter, when appropriate cases concerning State and county immunity are presented, it is our intention to take similar action to

---

[15] The Defendant suggests that Mass. Gen. Laws ch. 258, §§ 10(b), 10(h), and 10(j) apply.

abrogate immunity."). Heeding the call of the Supreme Judicial Court, the Massachusetts

Legislature enacted the Massachusetts Tort Claims Act in 1978.[16]

By 1993, the Massachusetts Legislature attempted to narrow potential liability of the

MTCA by gradually adding exceptions. See 258, § 10(e) - (j).[17] What we have today is a statute

with several exceptions that situates Massachusetts municipal liability somewhere between

common law's "King can do no wrong" conception of liability and the abrogated liability first

introduced in Whitney. This Court sifts through years of precedent, relying heavily on state

court decisions, to understand if the conduct that brings this action to this Court today is of the

nature the Commonwealth's legislators had envisioned the 258, § 10 exceptions would govern.

This Court thinks not.

The Town argues that exception § 10(h) applies to Salem's claim for negligent

supervision and/or training (Count 1) and negligent infliction of emotional distress (Count 5).

[Dkt. 60 at 6, 18].[18] Mass. Gen. Laws ch. 258, § 10(h) "shields municipalities" where "officers

negligently failed to prevent harm posed by third parties." See Reid v. City of Bos., 129 N.E.3d

867, 873 (2019). The Court fails to see how this exception applies as there are no allegations of

failure to establish a police department or failure to provide adequate police protection. See

---

[16] See also Joseph W. Glannon, The Massachusetts Tort Claims Act: Analysis and Update, 75 Mass. L. Rev. 52, 52 n.2 (1990).

[17] The exceptions enumerated in 258. § 10 essentially limit liability for public employers who are negligent in their oversight functions. The exceptions limit liability for: § 10(e) negligent licensing; § 10(f) negligent inspection by public employers; § 10(g) negligent fire prevention; § 10(h) negligent police; § 10(i) negligent handling of a release, parole or escape of persons in public custody; and § 10(j) actions, or lack of, that prevent or diminish the harmful consequences of a situation. See Kevin Barry, Brum v. Town of Dartmouth and the Public Duty Rule: Navigating an Interpretive Quagmire, 41 B.C. L. Rev. 383, 410-11 (2000).

[18] Mass. Gen. Laws ch. 258, § 10(h) limits liability for "any claim based upon the failure to establish a police department or a particular police protection service, or if police protection is provided, for failure to provide adequate police protection, prevent the commission of crimes, investigate, detect or solve crimes, identify or apprehend criminals or suspects, arrest or detain suspects, or enforce any law, but not including claims based upon the negligent operation of motor vehicles, negligent protection, supervision or care of persons in custody, or as otherwise provided in clause (1) of subparagraph (j)."

Melchionno v. Rizzo, No. CIV. A. 97-1355, 1998 WL 54368, at *2 (Mass. Super. Ct. Jan. 29, 1998) (explaining § 10(h) is inapplicable since there is "no claim that [the City] failed to establish a police department or that the police protection it did belatedly provide was inadequate."). Plus, § 10(h) does not apply when the harm is from an officer directly. See McGrath v. Town of Sandwich, 169 F. Supp. 3d 251, 256 (D. Mass. 2015) ("Because [the Plaintiff] claims that [the defendant officer] himself caused harm to [the plaintiff], § 10(h) immunity does not apply."); see also LeSiege v. Town of Sturbridge, No. 09-CV-30044-MAP, 2010 WL 1663991, at *4 (D. Mass. Mar. 24, 2010) (holding that the town is not immune under § 10 (h) since the "officer's negligent conduct was the direct and primary cause of the harm in question.").

Secondly, the Town argues that the negligent supervision and training claim is barred by Mass. Gen. Laws ch. 258, § 10(j).[19]  The Town quotes Ward v. City of Boston: "Claims of failure to train or supervise are all claims based on the failure to prevent or mitigate a harm, rather than participation in the initial injury-causing circumstance and thus are barred by § 10(j)." 367 F. Supp. 2d 7, 16 (D. Mass. 2005) (citations omitted); [Dkt. 60 at 7].  However, the custom at issue is not just a failure to supervise—it is the establishment of a system that permitted officers to disregard mandated reporting policies after using force.[20]  Thus, the Court

---

[19] Section 10(j) bars "any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer." Mass. Gen. Laws Ann. ch. 258, § 10(j).

[20] Additionally, the Court notes that there is disagreement whether a failure to supervise claim is even barred by § 10(j).  This Court makes no ruling on whether a failure to supervise claim is barred by § 10(j).  It merely notes that the Town's interpretation is not as well-settled as it claims.  In LaPierre v. City of Lawrence, the court found no distinction between a failure to supervise and a negligent hiring claim.  Specifically, the court reasoned, "I have some difficulty understanding this distinction. It is hard to see why a city should be liable for negligently hiring an employee and assigning him to a position where he can do harm, but should not be liable for negligently supervising and training him after it assigns him there . . . But where the underlying harm is committed by a public employee abusing his position, it is hard to see why section 10(j) should distinguish between a public employer negligently putting him in that position and one negligently supervising him in that position.  I therefore respectfully disagree

33

finds that the cases the Town cited are inapposite since they all pertain to the failure to prevent or mitigate harms.  See Armstrong v. Lamy, 938 F. Supp. 1018, 1044 (D. Mass. 1996); see also Chao v. Ballista, No. 07-CV-10934-NG, 2008 WL 5423206, at *3 (D. Mass. Oct. 24, 2008); Pettengill v. Curtis, 584 F. Supp. 2d 348, 366 (D. Mass. 2008); Doe v. D'Agostino, 367 F. Supp. 2d 157, 177 (D. Mass. 2005).  Many of these cases cited by the Town clarify that § 10(j) does not apply when a public employer affirmatively creates the danger.  Pettengill, 584 F. Supp. 2d at 367 (stating that claims for negligent hiring and promotion are affirmative actions that are not barred by § 10(j)); see also D'Agostino, 367 F. Supp. 2d at 177 (same); Doe v. Town of Stoughton, No. 17-CV-12337-IT, 2018 WL 1951180 at *6 (D. Mass. Apr. 25, 2018) (identifying a number of "affirmative acts" under § 10(j) that caused the injury, including an inadequate investigation and the establishment of a system that permitted sexual abuse of a student by a teacher).  Section 10(j) also does not apply to officers' negligent mistakes and employers' negligent promotions.  See Parks v. Town Leicester, No. 10-30120-FDS, 2011 WL 864823, at *6 (D. Mass. Mar. 9, 2011) (§ 10(j) does not apply in a case involving officers' mistake in identifying correct assailant); see also Galego v. City of Fall River, No. 22-12243-MPK, 2023 WL 8039295, at *3 (D. Mass. Nov. 20, 2023) (§ 10(j) does not apply in a case involving officers' mistake in going to the wrong floor and violently striking a man who was not the assailant); and Pettengill, 584 F. Supp. 2d at 367 (10(j) does not apply in a case involving the promotion of a librarian who sexually abused boys in the library).

Moreover, this Court finds that § 10(j)'s savings provision, § 10(j)(2), is applicable.  According to § 10(j)(2), § 10(j) does not apply to "the intervention of a public employee which

---

with the previous cases finding that section 10(j) bars a claim that a public employer negligently supervised and trained an employee." LaPierre v. City of Lawrence, No. 11-12039-RWZ, 2013 WL 1829120, at *4 (D. Mass. May 1, 2013).

causes injury to the victim or places the victim in a worse position that he was in before the intervention."  Mass. Gen. Laws ch. 258, § 10(j)(2).  The Court finds that that police detectives' affirmative act of intervening and putting Salem in a worse position than he was in before their arrival triggers the application of § 10(j)(2).  See Chao, 2008 WL 5423206, at *3 (applying § 10(j)(2) to claim where plaintiff was made worse after public employee's intervention); see also Town of Stoughton, 2018 WL 1951180 at *5-6 (finding the § 10(j)(2) exception applicable where the plaintiff was placed in a worse position by interventions that established a system that facilitated the sexual abuse of the plaintiff); Serrell v. Franklin Cnty.,713 N.E.2d 389, 393 (1999) (concluding § 10(j)(2) applied when visitor at correctional facility was injured by the intervention of a correctional officer attempting to subdue an inmate).

A reasonable jury could conclude that the Town was the "original cause" of Salem's harm since it had established a system that allowed officers to use force in disregard of the reporting policy.  To the extent the Town argues that § 10(j) immunizes employers from torts of their own employees, this is not supported by caselaw.  See LaPierre v. City of Lawrence, No. 11-12039-RWZ, 2013 WL 1829120, at *3 (D. Mass. May 1, 2013) ("The plain language of the statute . . . indicates a public employer should be liable for negligently failing to prevent harmful conduct by persons acting on its behalf.").  This Circuit has held that municipalities can be held liable where they "knew or should have known about an underlying, identifiable tort, which was committed by named or unnamed public employees."  Kennedy, 617 F.3d at 533.  Accordingly, the Court finds that the § 10(j) exception to evade liability also does not apply.

Lastly, the Town makes a fleeting reference that § 10(b), one of the original exceptions to the statute, bars the negligent training and supervision claim.  This exception requires this Court to answer a two-prong inquiry.  "The first step in deciding whether a plaintiff's claim is

foreclosed by the discretionary function exception of § 10(*b*) is to determine whether the governmental actor had any discretion at all as to what course of conduct to follow . . . The second and far more difficult step is to determine whether the discretion that the actor had is that kind of discretion for which § 10(*b*) provides immunity from liability." Harry Stoller & Co. v. City of Lowell, 587 N.E.2d 780, 782 (1992) (emphasis in original).  The court in Horta v. Sullivan, concluded that "whether a governmental actor's conduct involves discretion of the planning or policy-making type must be narrowly focused on the allegedly negligent conduct, not on whether the actor's conduct is part of some broader governmental policy." 638 N.E.2d 33, 36–37 (1994).  In Horta, the court was tasked with determining whether a police officer's decision to initiate a car chase was of the sort of discretion that § 10(b) immunizes.  The court reasoned it was not.  Specifically, the court asked whether "[i]n making his decision to commence and continue the chase, did [the officer's] discretion involve taking into account considerations of governmental policy or planning, or, did he make an ad hoc decision, based on the situation confronting him and not broader law enforcement objectives?"  Id.  The court found that the officer's decision involved no social or political considerations and bore no nexus to policy making or planning.  Id. at 37.

While this Court recognizes that the Town acted with discretion when it decided to disregard its reporting policy, this Court is not convinced that this act is of the type of discretion § 10(b) was designed to exempt government actors from.  This Court elects to apply the reading of Mass. Gen. Laws ch. 258 discussed in Horta – any other reading would render the statute

meaningless and would "go a long way toward restoring the governmental immunity that G.L. c. 258 was designed to eliminate." Id.[21]

### E.       Intentional Tort Claims (Counts 3, 4, 6, and 7)

Salem brings several intentional common law tort claims, including assault and battery (Count 3), intentional infliction of emotional distress (Count 4), false arrest (Count 6), and false imprisonment (Count 7), against the Town.  Public employers are liable for injury or loss caused by the wrongful act or omission of any public employee while acting within the scope of their employment except "any claim arising out of an intentional tort, including assault, battery, false imprisonment, false arrest, and intentional mental distress[.]"  Mass. Gen. Laws ch. 258, § 10(c); see also Freeman v. Town of Hudson, 849 F. Supp. 2d 138, 157 (D. Mass. 2012), aff'd, 714 F.3d 29 (1st Cir. 2013) ("[T]he Massachusetts Tort Claims Act, G.L. c. 258, § 10(c) bars claims against the Commonwealth, its agencies, and municipalities for intentional torts such as abuse of process and emotional distress.").

Assault and battery, intentional infliction of emotional distress, false arrest, and false imprisonment, are intentional torts Salem alleges were committed by the Town's employees. These torts are expressly exempted from the scope of employer liability under the Massachusetts Tort Claims Act.  Accordingly, this Court grants the Town summary judgment to Counts 3, 4, 6, and 7.

---

[21] Additional examples of government acts in which the Massachusetts Supreme Judicial Court has declined to apply the discretionary function exception include: A police officer deciding whether to remove from the roadways a motorist that was known to be intoxicated; a physician in her treatment of a patient in a hospital emergency room; the maintaining of a municipal parking lot; supervisory state police officials undertaking or failing to undertake disciplinary policies as to a state trooper; the monitoring of a probationer's compliance with the terms of his probation; and the failure to provide sufficient information to enable a person to protect his property against the conduct of a client of the Department of Mental Health.  See Harry Stoller & Co., 587 N.E.2d at 784 (citations omitted).

V.      CONCLUSION

For the foregoing reasons, the Town's Motion for Summary Judgment [Dkt. 59] is

**GRANTED IN PART and DENIED IN PART** and Salem's Motion for Summary Judgment

[Dkt. 64] is **DENIED**.  Claims 1, 2, and 5 remain and claims 3, 4, 6, and 7 are dismissed.

**SO ORDERED.**

Dated: September 27, 2024                                    /s/ Angel Kelley
                                                            Hon. Angel Kelley
                                                            United States District Judge